Honorable Mike K. Nakagawa, United States Bankruptcy Judge
On June 5, 2018, a hearing was held on the Motion for Partial Summary Judgment *713 brought by City National Bank ("CNB") in the above-captioned adversary proceeding. The appearances of counsel were noted in the record. After arguments were presented, the matter was taken under submission.[1]
BACKGROUND
On June 17, 2010, a voluntary Chapter 11 petition was filed by Charleston Associates, LLC ("Debtor"), in the United States Bankruptcy Court for the District of Delaware ("Delaware Bankruptcy Court"). (ECF No. 1). Debtor was the owner and developer of a 96-acre shopping center located in Las Vegas, Nevada. The shopping center was developed in three phases, the first two of which were completed. The third phase encompassing approximately 42 acres, was partially completed, leaving approximately 23 acres of land that was largely undeveloped (the "Undeveloped Land").
On November 24, 2010, Debtor commenced an adversary proceeding against RA Southeast Land Company, LLC ("RAS") and CNB, by filing a "Complaint for Declaratory Judgment" in the Delaware Bankruptcy Court. (AECF No. 1). The focal point of this dispute ("RAS Adversary") between the Debtor, its previous lender (CNB), and the purchaser from the lender (RAS), is on the rights with respect to the Undeveloped Land. Copies of ten documents, identified as Exhibits "A" through "I," were attached to the complaint. Those separately lettered exhibits consisted of the following: (A) a "Grant of Reciprocal Easements and Declaration of Covenants," dated as of January 31, 2001 ("REA"); (B) a "Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing," dated September 24, 2007, in favor of CNB ("CNB Deed of Trust"); (C) a "Settlement Agreement," dated July 21, 2009, between the Debtor and CNB ("Settlement Agreement"); (D) a "Trustee's Deed upon Sale," recorded August 11, 2009, reflecting CNB's foreclosure of the Undeveloped Land ("Trustee's Deed"); (E) an "Amendment to Grant of Reciprocal Easements and Declaration of Covenants," dated September 15, 2009 ("REA Amendment") ostensibly recorded by Boca Fashion Village, LLC ("BFV") and signed by Martin H. Walrath, IV; (F) a "re-recorded" Trustee's Deed Upon Sale, recorded July 21, 2010; (G) a "Memorandum of Transfer and Acceptance of Declarant's Rights and Assumption of Obligations," dated July 26, 2010; (H) an "Assignment and Assumption Agreement Regarding Declarant Rights," dated September 28, 2010, and (I) a letter dated October 29, 2010, transmitting a "Purchase and Sale Agreement and Joint Escrow Instructions," effective November 1, 2010, for the sale of the Undeveloped Land by the Debtor to Quality Real Estate Management, LLC ("QREM").
On December 29, 2010, the Delaware Bankruptcy Court entered an order transferring venue of the RAS Adversary to Nevada, where it was assigned Adversary No. 10-01452-LBR.
*714 On February 25, 2011, Debtor filed an amended complaint ("Complaint") framed as six "counts," i.e., causes of action or claims for relief. (AECF No. 37). Count I, apparently against both RAS and CNB, seeks a declaration that the Debtor, not RAS, is the Declarant under the REA.[2] Count II against both RAS and CNB seeks a declaration that both defendants violated the automatic stay and that sanctions for the violation are appropriate. Count III against only RAS seeks a declaration that RAS separately violated the automatic stay by removing various signs from the Undeveloped Land.[3] Count IV against only RAS alleges that RAS intentionally interfered with the Debtor's contractual relationships with its tenants. An additional Count IV against only RAS alleges that RAS tortiously interfered with prospective economic advantage. Mis-numbered Count V against both RAS and CNB alleges slander of title with respect to the Undeveloped Land. Exhibits identical to those accompanying the initial complaint are attached to the amended Complaint. Debtor alleges that under the REA, it had certain "Declarant Rights" in connection with the Undeveloped Land, that were not the subject of the CNB Deed of Trust, nor the Settlement Agreement, and which were not acquired by CNB through the foreclosure sale that resulted in the Trustee's Deed. In particular, Debtor alleges that after the foreclosure sale and before commencement of the instant Adversary Proceeding, the following occurred:
21. On September 15, 2009, Charleston recorded an Amendment to Grant of Reciprocal Easements and Declaration of Covenants ("Amendment to REA") ... The Amendment to REA memorialized the transfer of interests from Charleston to BFV and provided that BFV "hereby assumes the obligations of Declarant under the Declaration as set forth in Section 1.5." See Amendment to REA, Recital B.
22. On March 4, 2010, BFV was duly and lawfully merged into Charleston.
23. Upon information and belief, on September 24, 2010, CNB sold the Undeveloped Land to RAS.
24. On several occasions in 2010, in apparent anticipation of the upcoming sale to RAS or another party, an employee of CNB contacted a representative of Charleston, and asked the Charleston representative whether Charleston would agree to transfer the Declarant's rights to CNB. The Charleston representative informed the CNB employee that Charleston was then and would continue to be the Declarant and that Charleston would never agree to transfer of the Declarant's rights.
* * *
31. On November 1, 2010, Charleston entered into a Purchase and Sale Agreement ("Purchase and Sale Agreement"), a true and correct copy of which is attached hereto as Exhibit I, whereby Charleston agreed to sell to QREM or its assigns the Sears Site for $4,666,666.
*715 32. On November 8, 2010, Charleston filed a Motion of the Debtor and Debtor-in-Possession for an Order Authorizing the Sale of the Property Free and Clear of Liens, with the Proceeds of Such Sale to be Paid to the Debtor's Secured Lender (the "Sale Motion").
33. On November 16, 2010, the date of the scheduled hearing on the Sale Motion, RAS filed an Objection of RA Southeast Land Company, LLC to Motion of the Debtor and Debtor-in-Possession for an Order Authorizing the Sale of the Property Free and Clear of Liens, with the Proceeds of Such Sale to be Paid to the Debtor's Secured Lender ("the "Objection"). In its Objection, RAS claimed that it is now the Declarant under the REA and that, by virtue of that alleged fact, Charleston will be unable to amend the REA in accordance with one of the conditions contained in the Purchase and Sale Agreement. RAS argued that Charleston could not therefore close the sale of the Sears Site.
Complaint at ¶¶ 21, 22, 23, 24, 31, 32, and 33. Debtor therefore alleges that the REA Amendment properly transferred its interests in the REA to BFV, including the Declarant Rights. As a result, Debtor alleges that it has the ability to include the Declarant Rights in a sale to QREM notwithstanding the claim of RAS.
On March 28, 2011, CNB answered the Complaint, and also asserted a counterclaim ("CNB Counterclaim"). (AECF No. 54). The counterclaim is framed as six separate claims for relief against the Debtor: First - Breach of Contract, Second - Breach of Implied Covenant of Good Faith and Fair Dealing, Third - Declaratory Relief, Fourth - Fraudulent Inducement, Fifth - Negligent Misrepresentation, and Sixth - Slander of Title.[4] Attached as Exhibit "A" to the CNB Counterclaim is a copy of a "Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing," recorded October 4, 2010, to secure the sale of the Undeveloped Land by CNB to RAS.
On March 29, 2011, RAS also answered the Complaint, and also asserted a single counterclaim seeking declaratory relief and damages ("RAS Counterclaim"). (AECF No. 56). In its counterclaim, RAS alleges, inter alia, that "Charleston and CNB entered into an agreement ("Settlement Agreement") under which, among other things, Charleston agreed to a "friendly foreclosure" under which it would not contest CNB's efforts to cause there to be a Trustee's sale of the Undeveloped Property under the Deed of Trust." RAS Counterclaim at ¶ 15. It further alleges that "On August 11, 2009, pursuant to the Settlement Agreement, the Trustee's sale of the Undeveloped Land took place. Through a credit bid CNB acquired the Undeveloped Land and the inseparable right to become the successor Declarant pursuant to Section 1.5 of the REA." Id. at ¶ 16. Moreover, RAS alleges that "By deed recorded on October 4, 2010, RAS acquired the Undeveloped Land from CNB." Id. at ¶ 24. As of the result of the Debtor's conduct interfering with RAS's receipt and enjoyment of the Declarant Rights, see id. at ¶ 18, the prayer of RAS's counterclaim seeks entry of "an order (1) declaring that RAS Southeast Land Company, LLC is *716 the Declarant under the REA, (2) declaring the Post-Foreclosure Amendment of the REA null and void, (3) declaring that the filing of the Post-Foreclosure Amendment constitutes slander of title, and (4) awarding RA Southeast Land Company, LLC damages, costs of suit, and reasonable attorneys fees." Id. at 7:14-18.
On April 21, 2011, Debtor filed answers to the RAS Counterclaim and the CNB Counterclaim. (AECF Nos. 63 and 65).
On May 10, 2011, CNB filed a motion for summary judgment on all claims against it in the Debtor's Complaint, i.e., Count I, Count II and Count V, as well as on CNB's Third Counterclaim for declaratory relief. (AECF No. 68).
On May 11, 2011, RAS filed a motion for summary judgment on all claims against it in the Debtor's Complaint, i.e., Count I, Count II, Count III, both Counts IV, and Count V, as well as on RAS's counterclaim. That summary judgment motion by RAS did not request that the damages, costs of suit, and reasonable attorneys fees sought in the prayer of the RAS Counterclaim be awarded by summary judgment. (AECF No. 75).
On June 20, 2011, Debtor filed a combined opposition to both summary judgment motions along with a countermotion for partial summary judgment on Counts I and II of its Complaint. As previously mentioned at 713-14, supra, those two Counts seek a declaration that the Debtor possessed the Declarant Rights under the REA, and that both CNB and RAS violated the automatic stay by foreclosing on the Undeveloped Land and taking other actions thereafter. (AECF No. 92).
On July 11, 2011, RAS filed a reply in support of its summary judgment motion combined with an opposition to the Debtor's countermotion ("RAS Prior Opposition"). (AECF No. 110). On the same date, CNB also filed its reply and opposition. (AECF No. 112).
On July 25, 2011, a hearing was conducted on the summary judgment motions as well as the countermotion. The motions by CNB and RAS were denied. The countermotion by the Debtor was granted.
On October 5, 2011, an Order on Motions for Summary Judgment was entered, denying the summary judgment motions of CNB and RAS, and granting the countermotion for summary judgment brought by the Debtor. (AECF No. 120).
On December 1, 2011, an order was entered certifying the Order on Motions for Summary Judgment under FRCP 54(b). (AECF No. 145). On the same date, a Partial Summary Judgment was entered. (AECF No. 146). Additionally, a Supplemental Order on Summary Judgment Motions was entered.[5] (AECF No. 147).[6]
On December 14, 2011, RAS filed a notice of appeal. (AECF No. 151).[7] On the *717 same date, CNB also filed a notice of appeal. (AECF No. 153).[8]
On December 15, 2011, CNB filed an election for its appeal to be heard by the United States District Court for the District of Nevada ("USDC"). (AECF No. 156).[9]
On September 28, 2012, an order was entered by the Delaware Bankruptcy Court confirming the Debtor's Chapter 11 plan of reorganization ("Plan"). (ECF Nos. 725 and 809). Pursuant to the confirmed plan, New Boca Syndications Group, LLC ("New Boca") acquired the shopping center, see Plan, Art. II., A., 8, which generates rental proceeds from its various tenants. In addition to acquiring the shopping center, New Boca assumed the Debtor's liability for the claims asserted by CNB and RAS in the RAS Adversary. See Plan, Art. VII., C.
On January 15, 2013, the Delaware Bankruptcy Court entered an order transferring venue of the Chapter 11 proceeding to Nevada, where it was assigned Case No. 13-10499-LBR.[10]
On July 25, 2013, the USDC entered an order reversing the Nevada bankruptcy court's Prior PSJ Order ("Reversal Order"). (USECF No. 70;[11] AECF No. 207).
On August 23, 2013, Debtor filed a notice appealing the Reversal Order to the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit").[12] (USECF No. 78).
On January 25, 2016, the Ninth Circuit affirmed the USDC's Reversal Order ("Circuit Order"). 632 Fed.Appx. 362 (9th Cir. 2016).[13]
*718 On February 17, 2016, after expiration of the period for filing a petition for rehearing under FRAP 41(b), the Ninth Circuit mandate to the USDC was entered. (USECF No. 108).
On March 3, 2016, the USDC entered an order spreading the Ninth Circuit mandate on the record in the case. (USECF No. 111).
On October 5, 2017, an order was entered scheduling ten non-consecutive trial days for the instant adversary proceeding, between September 4, 2018 and October 4, 2018. (AECF No. 513). The order also scheduled a pretrial conference to be conducted on August 15, 2018, and also set forth various discovery deadlines.
On March 26, 2018, CNB filed the instant Motion for Partial Summary Judgment ("Partial MSJ"). (AECF No. 580). CNB seeks summary judgment on its First Counterclaim and Second Counterclaim, i.e., for breach of contract and breach of the implied covenant of good faith and fair dealing, against both the Debtor and New Boca. The motion is accompanied by the Declaration of Kevin P. McKenna ("McKenna") ("McKenna Declaration") and a Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment ("SUF").[14] (AECF Nos. 581 and 582). Notice of the hearing on the Partial MSJ was served electronically on, inter alia , counsel for the Debtor, New Boca, and RAS. (AECF No. 583)
On April 13, 2018, an order was entered approving a stipulation to extend the discovery deadlines. (AECF No. 589).
On May 14, 2018, Debtor filed a response to the SUF ("SUF Response") (AECF No. 592),[15] as well as an opposition to the Partial MSJ ("Opposition"). (AECF No. 593). Attached to the Opposition is a Declaration of Paul R. Hejmanowski to *719 authenticate a variety of exhibits, including copies of declarations previously filed in this adversary proceeding, the Reversal Order, the Circuit Order, transcripts, emails, and other items.
On May 24, 2018, CNB filed a reply in support of the Partial MSJ ("Reply"), accompanied by an additional declaration from McKenna ("Second McKenna Declaration") and a declaration from Garff ("Garff Declaration"). (AECF Nos. 599, 600 and 601).
APPLICABLE LEGAL STANDARDS
A motion for summary judgment filed in an adversary proceeding is governed by FRCP 56 and made applicable by FRBP 7056. See Silva v. Smith's Pac. Shrimp, Inc. (In re Silva), 190 B.R. 889, 891 (9th Cir. BAP 1995). In a related matter, the USDC discussed the standards applicable to summary judgment motions as follows:
The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." Nw. Motorcycle Ass'n v. U.S. Dep't of Agric. , 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; see Celotex Corp. v. Catrett , 477 U.S. 317, 322-23 [106 S.Ct. 2548, 91 L.Ed.2d 265] (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248-49 [106 S.Ct. 2505, 91 L.Ed.2d 202[ (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. See id. at 250-51 [106 S.Ct. 2505]. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " Aydin Corp. v. Loral Corp. , 718 F.2d 897, 902 (9th Cir. 1983) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co. , 391 U.S. 253, 288-89 [88 S.Ct. 1575, 20 L.Ed.2d 569] (1968) ). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. Kaiser Cement Corp. v. Fishbach [Fischbach ] & Moore, Inc. , 793 F.2d 1100, 1103 (9th Cir. 1986).
The moving party bears the burden of showing that there are no genuine issues of material fact. Zoslaw v. MCA Distrib. Corp. , 693 F.2d 870, 883 (9th Cir. 1982). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos. , 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." Anderson , 477 U.S. at 256 [106 S.Ct. 2505]. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," Bhan v. NME Hosps., Inc. , 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." Orr v. Bank of Am. , 285 F.3d 764, 783 (9th Cir. 2002)
*720 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 586 [106 S.Ct. 1348, 89 L.Ed.2d 538] (1986) ). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." Anderson , 477 U.S. at 252 [106 S.Ct. 2505].
RA Southeast Land Co. LLC v. First Am. Title Ins. Co., 2016 WL 4591740, at *2 (D. Nev. Sept. 2, 2016).
DISCUSSION
The court having considered the written and oral arguments and representations of counsel, together with the record in this adversary proceeding and the Chapter 11 case, concludes that the Partial MSJ must be granted in part and denied in part.
A. CNB's First, Second and Third Counterclaims.
The First Counterclaim alleges that the Debtor "breached the terms of the Settlement Agreement by materially interfering with the foreclosure of the Undeveloped Land by later claiming that the foreclosure did not include a transfer of the Declarant rights." CNB Counterclaim at ¶ 52. CNB alleges that Sections 2.1 and 2.2 of the Settlement Agreement establish the circumstances of the Debtor's breach, as follows:
21. Section 2.1(a) of the Settlement Agreement states in pertinent part that "[CNB] shall, without opposition from [Charleston] ... foreclose or cause the occurrence of a deed of trust sale with respect to the Deed of Trust, in accordance with applicable state law ... " (Emphasis added.)[16]
22. Section 2.1(c) of the Settlement Agreement states that [CNB] agrees for the benefit of the Borrower and Guarantor to make a full credit bid at the foreclosure sale of the Property to the effect that the Remaining Balance Due and any additional interest, costs or charges accruing after the Effective Date shall be fully paid and no possibility of a deficiency between the full credit bid and the Obligations shall exist, it being understood that, but virtue of the full credit bid, no claims may be asserted against Borrower and/or Guarantor after completion of the foreclosure sale of the Property. (Emphasis added.)
23. Section 2.2 of the Settlement Agreement states that: Lender has entered into the agreements set forth in Section 2.1 above with the understanding that neither Borrower, Guarantor, nor any affiliate of Borrower or Guarantor, will materially interfere with the foreclosure of the Property or delay the foreclosure by any means whatsoever, whether lawful or unlawful. Should such material interference or delay occur, Lender shall be relieved of any obligation to make a full credit bid or to complete the foreclosure of the Property within any specified period of time and may pursue all available remedies against Borrower and/or Guarantor for recovery *721 of the Obligations including but not limited to the commencement of a judicial action. (Emphasis added.)[17]
CNB Counterclaim at ¶¶ 21, 22 and 23. (Emphasis added.)[18]
CNB further alleges that it completed the foreclosure sale on August 11, 2009, see CNB Counterclaim at ¶ 29, after which the Debtor took several actions to materially interfere with the foreclosure. The alleged actions included the Debtor's unauthorized use of portions of the Undeveloped Land for customer parking, see CNB Counterclaim at ¶ 30, recordation of the REA Amendment in favor of BFV, see id. at ¶¶ 34, 35 and 36, continued assertions that it is the Declarant, see id. at ¶¶ 43 and 44, and an attempt to sell a portion of the property that is the subject of the Declaration. Id. at ¶¶ 45 and 46. In particular, CNB alleges that the Debtor materially interfered "with the foreclosure of the Undeveloped Land by later claiming that the foreclosure did not include a transfer of the Declarant rights." Id. at ¶ 52. As a result of the alleged breach, CNB seeks damages according to proof, see id. at ¶ 53, in addition to collection costs, legal expenses, and attorneys' fees pursuant to the Settlement Agreement. Id. at ¶ 54.[19]
The Second Counterclaim alleges the Debtor breached the "implied covenant of good faith and fair dealing" even if the court concludes that the Debtor "has not breached an express term of the Settlement Agreement." CNB Counterclaim at ¶¶ 56 and 58. The alleged actions in violation of the implied covenant included the Debtor's refusal to acknowledge in writing that the foreclosure sale included the Declarant Rights, see id. at ¶ 60, Debtor's unauthorized use of portions of the Undeveloped Land for customer parking, see id. at ¶¶ 61, 62, 63 and 64, and Debtor's continued claim that it holds the Declarant Rights notwithstanding completion of the foreclosure sale. Id. at ¶ 64. As a result of the alleged breach, CNB seeks damages according to proof, see id. at ¶ 65, in addition to its attorney's fees and costs. Id. at ¶ 66.
The Third Counterclaim alleges the existence of a present controversy over whether RAS received the Declarant Rights *722 from CNB after CNB completed its foreclosure of the Undeveloped Land, or whether the Debtor retained the Declarant Rights because the CNB foreclosure of the Undeveloped Land did not include those rights. See CNB Counterclaim at ¶¶ 68 and 69. CNB seeks a declaration "that the foreclosure under the Deed of Trust included a foreclosure of Charleston's rights as Declarant under the REA, and that the transfer of the Declarant's rights from CNB to RAS was valid, resulting in RAS as the current Declarant." Id. at ¶ 72.
B. Determinations on Appeal.
The Prior PSJ Order entered by this court denied CNB's request for summary judgment on its Third Counterclaim as well as on the Debtor's claims in the Complaint against CNB. The Prior PSJ Order also granted the Debtor's countermotion for summary judgment on Count I of its complaint for a declaration that it continued to own the Declarant Rights, as well as on Count II for a declaration that CNB and RAS violated the automatic stay by taking postbankruptcy actions affecting those Declarant Rights. Neither CNB nor the Debtor sought summary judgment with respect to CNB's First Counterclaim and Second Counterclaim.
The USDC, however, reversed the Prior PSJ Order. The USDC rejected this court's conclusion that the Debtor retained the Declarant Rights after CNB's foreclosure pursuant to the Settlement Agreement. Among other things, the USDC concluded that the REA Amendment purporting to transfer the Declarant Rights to BFV was unenforceable and invalid. See Reversal Order at 10:25. It found "that CNB is the proper owner of the Declarant Rights after its foreclosure of the Undeveloped Land because it foreclosed not just on the real property, but also on the collateral associated with the real property (which includes the Declarant Rights)." Id. at 10:27 to 11:2. More important, the USDC concluded that the estate created by the CNB Deed of Trust included "the Declarant Rights as property of the Trust Estate." Id. at 12:5-7. As a result, the USDC interpreted Section 2.1(a) of the Settlement Agreement "to mean that CNB's foreclosure transfers all of Charleston's interests in the Trust Estate." Id. at 12:16-17.
Moreover, the USDC concluded that because CNB obtained the Declarant Rights when it completed its foreclosure sale on August 11, 2009, those rights were not property of the Debtor's bankruptcy estate when it filed the Chapter 11 petition on June 17, 2010. See Reversal Order at 10:26 to 13:16. As a result, the automatic stay did not apply, and the postpetition actions of CNB and RAS did not violate the automatic stay. Id. at 13:18 to 15:7.[20] In light of its conclusions, the USDC not only reversed the Prior PSJ Order, but also remanded "with instructions for the Bankruptcy Court to award summary judgment in favor of CNB and RAS." Id. at 14:14-15 (emphasis added).
The Ninth Circuit agreed with the USDC and affirmed the USDC's decision to reverse the Prior PSJ Order. In pertinent part, the Ninth Circuit concluded that:
The district court correctly determined that Charleston retained possession of the Declarant's Rights into 2007 and pledged the Declarant's Rights to CNB as part of a Deed of Trust, Assignment *723 of Rents, Security Agreement and Fixture Filing ("Deed of Trust"). While Charleston argues that it transferred the Declarant's Rights to one of its affiliates in 2002 via an oral transfer agreement, the purported oral transfer did not comport with the unambiguous terms of the Grant of Reciprocal Easements and Declaration of Covenants ("REA"), which governs the Declarant's Rights and the development of the forty-one-acre property.
632 Fed.Appx. at 363 (emphasis added). The Ninth Circuit further concluded that:
The district court also correctly determined that the Settlement Agreement executed by Charleston and CNB upon Charleston's default under the Deed of Trust unambiguously provided for the transfer of the Declarant's Rights from Charleston to CNB via a Trustee's Sale.
632 Fed.Appx. at 363 (emphasis added). Finally, the Ninth Circuit concluded that
The Deed of Trust expressly provided that "[a]ll rights that [Charleston] may have as declarant under any covenants, conditions or restrictions affecting the Property" were included as part of the Trust Estate. And, under the terms of the Settlement Agreement, CNB agreed to "foreclose or cause the occurrence of a deed of trust sale with respect to the Deed of Trust, in accordance with applicable state law." Because the Settlement Agreement is not "susceptible to more than one interpretation," Shelton v. Shelton , 119 Nev. 492, 78 P.3d 507, 510 (2003), and its plain language unambiguously provided for the Declarant's Rights to transfer to CNB via a Trustee's Sale, the district court correctly concluded that Charleston's interest in the Declarant's Rights automatically passed to CNB at the conclusion of the Trustee's Sale, Charmicor, Inc. v. Bradshaw Fin. Co. , 92 Nev. 310, 550 P.2d 413, 415 (1976). We hold, therefore, that the district court properly instructed the bankruptcy court to award summary judgment in favor of CNB and RA Southeast. [21]
632 Fed.Appx. at 363 (emphasis added).
C. Law of the Case.
The law of the case doctrine applies in bankruptcy proceedings. See Federal Deposit Insurance Corporation v. Kipperman (In re Commercial Money Center), 392 B.R. 814, 832-33 (9th Cir. BAP 2008). In Stacy v. Colvin, 825 F.3d 563 (9th Cir. 2016), the circuit panel observed as follows:
The law of the case doctrine generally prohibits a court from considering an issue that has already been decided by that same court or a higher court in the same case...The doctrine is concerned primarily with efficiency, and should not be applied when the evidence on remand is substantially different, when the controlling law has changed, or when applying the doctrine would be unjust...A district court's discretionary decision to apply the law of the case doctrine is reviewed for an abuse of discretion...
825 F.3d at 567 (citations omitted and emphasis added).[22]
Because the doctrine is designed to prevent relitigation of issues that already *724 have been decided, the burden lies with the party opposed to the application of the doctrine to demonstrate a substantial difference in the evidence, a change in controlling law, or that application of the doctrine is unjust. See, e.g., Tate v. University Medical Center of Southern Nevada, 2016 WL 7045711, at *3-4 (D. Nev. Dec. 2, 2016) (granting motion in limine to prevent plaintiff from relitigation of issues adversely determined by Ninth Circuit in its order of remand).
The related "rule of mandate" also applies in bankruptcy proceedings. See, e.g., Barton Properties v. Blaskey (In re Blaskey), 2016 WL 4191775, at *5 (9th Cir. BAP Aug. 8, 2016) (bankruptcy court on remand correctly applied the mandate of the Bankruptcy Appellate Panel on prior appeal). The rule of mandate applies to an appellate decision rendered in the same proceeding. The Ninth Circuit has explained that
A district court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it...At the same time, the rule of mandate allows a lower court to decide anything not foreclosed by the mandate...A district court is limited by our remand when the scope of the remand is clear...Violation of the rule of mandate is a jurisdictional error...
Hall v. City of Los Angeles, 697 F.3d 1059, 1067 (9th Cir. 2012) (citations omitted, emphasis added). See also Stacy v. Colvin, 825 F.3d at 567-68.
D. Summary Judgment is Both Required and Appropriate in this Proceeding.
Both the Ninth Circuit and the USDC concluded that this court erred in granting summary judgment in favor of the Debtor. That portion of the Prior PSJ Order was reversed. The Prior PSJ Order also denied summary judgment on CNB's motion with respect to Counts I, II and V of the Complaint as well as CNB's Third Counterclaim for a declaration "that the foreclosure under the Deed of Trust included a foreclosure of Charleston's rights as Declarant under the REA, and that the transfer of the Declarant's rights from CNB to RAS was valid, resulting in RAS as the current Declarant." That portion of the Prior PSJ Order also was reversed, and the mandate of both the Ninth Circuit and the USDC directed this court to "award summary judgment in favor of CNB..." Additionally, the Prior PSJ Order denied summary judgment on RAS's motion with respect to all of the Counts in the Complaint, as well as RAS's Counterclaim for a declaration that RAS is the Declarant under the REA, that the REA Amendment is null and void, and that the REA Amendment constitutes slander of title. Those portions of the Prior PSJ Order also were reversed, and the mandate of both the Ninth Circuit and the USDC directed this court to "award summary judgment in favor of...RAS."
The rule of mandate requires this court to award summary judgment in its favor to CNB on Counts I, II and V of the Debtor's Complaint, as well as on CNB's Third Counterclaim for declaratory relief. Although the rule of mandate does not require that a request be made by parties in interest, the court will await an appropriate motion from RAS requesting entry of summary judgment on all of the Counts set forth in the Complaint as well as on the RAS Counterclaim. The RAS Counterclaim *725 seeks damages, costs of suit, and reasonable attorneys fees, for which a sufficient evidentiary record must be provided.
The law of the case doctrine also persuades this court to award summary judgment in favor of CNB on its First Counterclaim. Both the USDC and the Ninth Circuit concluded that the Settlement Agreement "unambiguously provided for the transfer of the Declarant's Rights from Charleston to CNB via a Trustee's Sale." Circuit Order, 632 Fed.Appx. at 363 ; Reversal Order at 13:14-16 ("Because the express terms of the Settlement Agreement support CNB's position, the Court need not look beyond those terms in absence of any ambiguity as to the Agreement's interpretation."). As the Borrower under the Settlement Agreement, Debtor agreed in Section 2.2 that it would not "materially interfere with the foreclosure of the Property..."
There is no dispute, however, that after CNB completed the foreclosure sale on August 11, 2009, it was the Debtor that recorded the REA Amendment on or about September 15, 2009, purporting to transfer the Declarant Rights to BFV. See discussion at 714-15, supra. There is no dispute that after CNB completed the foreclosure sale, it was the Debtor that continued to assert that it held the Declarant Rights in response to inquiries from CNB. Id. There is no dispute that after CNB completed the foreclosure sale, it was the Debtor that attempted to sell the Declarant Rights to QREM. Id. There is no dispute that after CNB completed the foreclosure sale, RAS, as the post-foreclosure purchaser from CNB, was required to object to the Debtor's attempt to sell the Declarant Rights to QREM. Id. There is no dispute that the USDC concluded that the purported transfer under the REA Amendment is "unenforceable and invalid." Reversal Order at 10:24-25.[23] Under these circumstances, the court concludes that the Debtor interfered with CNB's foreclosure of the Undeveloped Land[24] and that the interference was and continues to be material. As a result, the court concludes that the Debtor has breached the express terms of Section 2.2 of the Settlement Agreement.[25]
*726 There also is no dispute that CNB was required by the Settlement Agreement to credit bid the full amount of its claim at the foreclosure sale of the Undeveloped Land. There is no dispute that CNB credit bid the amount of $25,231,030.98 at the foreclosure sale. See SUF Response at ¶ 25; Trustee's Deed at 2. There is no dispute that after the foreclosure sale was completed, CNB sold the Undeveloped Land to RAS for the amount of $11,750,000 under the Final Sale Agreement. See SUF Response at ¶ 37. As damages for the breach of the Settlement Agreement, CNB seeks the difference between the amount of its credit bid at the foreclosure sale and the value of the Undeveloped Property at the time of the foreclosure sale. See Partial MSJ at 12:22-24. CNB argues that the difference is the best measure of its damages because an agreement to credit bid the full amount of its claim would result in the loss of any possible deficiency claim. The court agrees.
Instead of arguing that the subsequent sale price to RAS in October 2010 was the best evidence of the value of the Undeveloped Land, CNB offers the testimony of its representative, McKenna, who attests that the value of the property at the time of the foreclosure sale was no more than $18,380,000.00. See McKenna Declaration ¶ 11; Supplemental McKenna Declaration at ¶ 6. CNB also offers the 2009 Garff Appraisal. See Partial MSJ at 13:5-8. According to Garff, as of August 14, 2009, the Undeveloped Land had an "as is" value of $18,380,000.00. See also Garff Declaration at ¶ 4.[26] The difference between the credit bid at the foreclosure sale completed on August 11, 2009, and the value asserted by McKenna and Garff, is $6,851,030.98. Debtor objects to admission of the 2009 Garff Appraisal as hearsay, see note 14, supra, but has not objected to the testimony of McKenna. See Opposition at 18:18 to 20:2.[27] As the representative of the owner of the Undeveloped Land after completion of the foreclosure sale, McKenna's testimony as to its value is admissible. See In re Lake Tahoe Partners, L.L.C., 2016 WL 1626798, at *3 (Bankr. N.D. Cal. Apr. 21, 2016).[28] The McKenna testimony alone is sufficient to meet CNB's evidentiary burden on summary judgment.[29] In absence *727 of contrary evidence from the Debtor, there is no genuine issue that the value of the Undeveloped Land was no more than $18,380,000 as of the date of the foreclosure sale. Because there is no genuine dispute that CNB's credit bid in the full amount complied with the terms of the Settlement Agreement, the court concludes that $6,851,030.98 is the appropriate measure of damages.
Because CNB is entitled to judgment as a matter of law with respect to its First Counterclaim, it is unnecessary for the court to address the Second Counterclaim. Notwithstanding the Debtor's breach of the express terms of the Settlement Agreement, however, Debtor asserts that recovery by CNB should be denied on an "unclean hands" theory. See Opposition at 17:7 to 18:17. Additionally, the Debtor suggests that additional damages for breach of the Settlement Agreement cannot be awarded because CNB previously was awarded $835,512.15 in attorneys fees by the bankruptcy court, and an additional $540,088.55 in attorneys fees by the USDC in connection with the appeals. Id. at 20:14-25. Neither assertion has merit.[30]
CNB's First Counterclaim is a claim at law for breach of contract. The court has concluded that the Debtor breached the express terms of the Settlement Agreement. Unclean hands is an equitable doctrine that bars a party from seeking equitable relief, reflecting the equitable maxim that "he who seeks equity must do equity." See Manufacturers' Finance Co. v. McKey, 294 U.S. 442, 451, 55 S.Ct. 444, 79 L.Ed. 982 (1935). The doctrine is designed to preserve the dignity of the court by preventing it from becoming a participant in inequitable conduct. See In re Rose, 565 B.R. 178, 182 (Bankr. D. Nev. 2017). The Settlement Agreement was the product of negotiations between the Debtor and CNB that both prescribed and proscribed particular conduct. The USDC concluded that the Declarant Rights were subject to the foreclosure sale and this court has concluded that the Debtor's subsequent conduct materially interfered with the foreclosure. These are legal conclusions and legal solutions for which the equitable defense of unclean hands simply does not apply.[31]
*728 The prior awards of attorneys fees were not a component of damages on the CNB Counterclaim. Under the American Rule, " '[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise.' " Baker & Botts L.L.P. v. ASARCO LLC, --- U.S. ----, 135 S.Ct. 2158, 2164, 192 L.Ed.2d 208 (2015), quoting Hardt v. Reliance Standard Life Ins., 560 U.S. 242, 252-253, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010). In the instant case, the bankruptcy court previously awarded attorneys fees to CNB on August 13, 2014, pursuant to Section 7.8 of the Settlement Agreement. See Order Granting Motion of City National Bank for Attorney's Fees and Costs. (AECF No. 332). Additionally, on April 19, 2017, the USDC awarded CNB attorneys fees pursuant to Section 7.8 of the Settlement Agreement and Section 11.4 of the REA,[32] for services provided after the bankruptcy court's fee award. See Order Granting in Part and Denying in Part City National Bank's Motion for Attorneys' Fees. (USECF No. 134).[33] In neither instance were the attorneys fees awarded as part of a damage award on the CNB Counterclaim. In short, the damage award on the First Counterclaim is separate and apart from the previous awards of attorneys fees. As a result, those awards of attorneys' fees do not preclude the award of the damages for breach of the Settlement Agreement.
CONCLUSION
Based on the foregoing, the court concludes that the Partial MSJ must be granted with respect to the First Counterclaim. Damages in the amount of $6,851,030.98 are awarded on the First Counterclaim. Because liability and damages have been determined on the First Counterclaim, it is unnecessary to reach the Second Counterclaim. Thus, the Partial MSJ with respect to the Second Counterclaim will be denied without prejudice.[34]
*729 Pursuant to the mandate of the USDC and Ninth Circuit, summary judgment in favor of CNB and against the Debtor will be entered with respect Counts I, II and V of the Debtor's Complaint, as well as with respect to CNB's Third Counterclaim.[35]
A separate order has been entered contemporaneously with this Memorandum Decision.

Unless otherwise stated in this Memorandum, all references to "Section" are to the provisions of the Bankruptcy Code ("Code"), 11 U.S.C. §§ 101 -1532. All references to "NRS" are to provisions of the Nevada Revised Statutes. All references to "FRBP" are to provisions of the Federal Rules of Bankruptcy Procedure. All references to "FRCP" are to the Federal Rules of Civil Procedure. All references to "FRE" are to the Federal Rules of Evidence. All references to "FRAP" are to the Federal Rules of Appellate Procedure. All references to "ECF No." are to the numbers assigned to the documents filed in the above-captioned Chapter 11 proceeding as they appear on the docket maintained by the clerk of the court. All references to "AECF No." are to the documents filed in the above-captioned adversary proceeding.

The prayer immediately following the allegations of Count I seeks a declaration only in favor of the Debtor and against RAS.

Counts II and III allege: that the actions taken by CNB and RAS after the commencement of the Chapter 11 proceeding on June 17, 2010, violated the automatic stay under Section 362(a); that various documents recorded by CNB and RAS are void as a matter of law; and that CNB and RAS are subject to sanctions under Section 362(k).

After setting forth the six separate counterclaims for relief, CNB alleges an unnumbered "Request for Relief" in the form of rescission and/or reformation of the Settlement Agreement in the event the court concludes that there is an equitable basis to do so. See CNB Counterclaim at ¶¶ 109, 110, 111, 112, 113, 114, 115, and 116.

The Supplemental Order specifies that CNB's summary judgment motion is denied, RAS's summary judgment motion is denied, and that Debtor's countermotion is granted in its entirety. It further specifies that the Debtor is the Declarant under the REA. It also states that with "respect to the first and second causes of action asserted by Charleston, CNB and RAS are declared to have violated the automatic stay." However, as previously mentioned at 713-14, supra, only Count II in the Complaint alleges that both CNB and RAS violated the automatic stay.

The initial Order on Summary Judgment Motions entered on October 5, 2011, the Partial Summary Judgment entered on December 1, 2011, and the Supplemental Order on Summary Judgment Motions entered December 1, 2011, are hereafter referred to as "Prior PSJ Order."

RAS's appeal encompassed both summary judgment orders as well as the partial summary judgment.

CNB's appeal encompassed the partial summary judgment and the supplemental summary judgment order.

RAS also filed a statement of election to have its appeal heard by the USDC. The statement of election apparently was filed with the Bankruptcy Appellate Panel of the Ninth Circuit, with a copy filed with the USDC, but not with the bankruptcy court. The CNB and RAS appeals of the Prior PSJ Order were assigned to the same district judge and were denominated Case Nos. 2:11-cv-02023-MMD-PAL and 2:11-cv-2104-MMD-NJK. The first case was designated as the lead case.

On December 29, 2014, both the Chapter 11 proceeding and the RAS Adversary were reassigned to this court upon the retirement of the previously assigned bankruptcy judge.

All references to "USECF No." are to the documents filed with the USDC in the lead case on appeal. This court may take judicial notice under FRE 201 of the materials appearing on the docket of the USDC. See United States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980) ; Conde v. Open Door Marketing, LLC, 223 F.Supp.3d 949, 970 n.9 (N.D. Cal. 2017) ; Gree v. Williams, 2012 WL 3962458, at *1 n.1 (D.Nev. Sep. 7, 2012).

On August 26, 2013, the bankruptcy court entered summary judgment in favor of CNB and RAS pursuant to the Reversal Order. (AECF No. 210). On November 5, 2013, however, the USDC granted the Debtor's motion for an order directing the bankruptcy court to vacate that summary judgment order because it had been entered prematurely. (USECF No. 99; AECF No. 226).

On May 24, 2017, CNB filed in the RAS Adversary and in the Chapter 11 case, a motion to substitute New Boca as the plaintiff and counterclaim defendant, and to enforce the Plan with respect to the attorney's fees that had been awarded by the USDC ("Substitution Motion"). (AECF No. 466; ECF No. 936). First American Title Company ("FATCO"), as assignee of the claims of RAS, filed a joinder. (AECF No. 472). An opposition was filed by the Debtor (AECF No. 473), and CNB filed a reply. (AECF No. 475). On June 21, 2017, the Substitution Motion was heard by this court and was granted in part and denied in part. On July 7, 2017, a written order on the motion was entered ("Substitution Order") in the RAS Adversary and in the Chapter 11 case. (AECF No. 494; ECF No. 953). The Substitution Order granted the motion and directed New Boca, "as the reorganized debtor and successor to" the Debtor under the confirmed Chapter 11 plan, to pay the attorney's fees awarded by the USDC. The Substitution Order also denied without prejudice CNB's request to join New Boca as a party to the RAS Adversary. On July 18, 2017, a separate judgment against New Boca in the amount of $540,088.55 was entered in favor of CNB in the RAS Adversary and in the Chapter 11 case ("CNB Fee Judgment"). (AECF No. 496; ECF No. 958). CNB successfully garnished certain rents that had been deposited into certain accounts maintained by New Boca at Wells Fargo Bank ("Wells Fargo"). On September 27, 2017, CNB filed a Satisfaction of Judgment. (AECF No. 510).
Thereafter, U.S. Bank National Association, N.A. ("US Bank") filed a Petition for Return of Improperly Garnished Property ("Garnishment Return Petition"), asserting that it had a superior interest in the rent deposits. (AECF No. 531). That Petition was filed by US Bank as a pleading in the RA Southeast Adversary and was opposed by CNB. On December 12, 2017, this court entered an order denying the Petition. (AECF No. 539). US Bank appealed that order to the USDC. (AECF No. 546).

Attached to the SUF are twelve numbered exhibits, consisting of copies of the following: (1) the REA, (2) the CNB Deed of Trust, (3) the Settlement Agreement, (4) the Trustee's Deed, (5) an Appraisal of the Undeveloped Land dated August 21, 2009, prepared by Gordon L. Garff ("Garff") for American Property of Nevada ("2009 Garff Appraisal"), (6) a Sales Price Evaluation by CBRE Land Sales Group, dated August 31, 2009 ("Broker's Price Opinion"), (7) the REA Amendment, (8) a "Purchase and Sale Agreement and Joint Escrow Instructions" dated April 21, 2010, between CNB and RAS ("First Sale Agreement"), (9) a "Purchase and Sale Agreement and Joint Escrow Instructions" dated August 18, 2010, between CNB and RAS ("Final Sale Agreement"), (10) a Declaration of Jeffrey P. Dragovich in support of Debtor's prior summary judgment countermotion, (11) the Reversal Order, and (12) the Circuit Order.

In its response, Debtor objects to the admission of the 2009 Garff Appraisal and Broker's Price Opinion based on lack of authentication and hearsay. See SUF Response at ¶¶ 26 and 27. Other than these evidentiary objections, Debtor has offered no contrary evidence of value of the Undeveloped Land at any point in time.

Under Section 6.1 of the Settlement Agreement, if the Borrower's conduct in violation of Section 2.1(a) prevents a foreclosure or deed of trust sale, the Lender may elect to revive and reinstate the settled obligations. If the Lender elects to do so, Section 6.2 of the Settlement Agreement imposes a variety of surrender and reimbursement obligations on the Lender. Because there is no dispute that the foreclosure sale of the Undeveloped Land was never prevented and, in fact, actually took place, neither Section 6.1 nor Section 6.2 apply. Debtor's arguments in reliance on these provisions, see Opposition at 3:12 to 5:9, are misguided.

Under Section 2.2 of the Settlement Agreement, a "material interference or delay" caused by the Borrower, relieved CNB of any obligation to make a full credit bid or complete the foreclosure and also provided that CNB "may pursue all available remedies against the Borrower for recovery of the Obligations including but not limited to the commencement of a judicial action."

Not mentioned in the First Counterclaim is Exhibit "A" to the Settlement Agreement. Exhibit "A" is an Indemnification Agreement between CNB, the Debtor, and its guarantor, Intercontinental Investment Syndications Ltd., fka Triple Five National Development Corporation, dated July 21. 2009. One of the recitals states that "Borrower and Guarantor have agreed not to oppose, delay or interfere with the foreclosure sale and Lender's agreements under the Settlement Agreement are contingent upon the performance by Borrower and Guarantor of their obligations under the Settlement Agreement." The Indemnification Agreement also states that the "Recitals set forth above are intended to be part of the terms of this Indemnification Agreement." The terms of the Indemnification Agreement are incorporated under Section 7.7 of the Settlement Agreement, and this recital mirrors the requirements of Sections 2.1(a) and 2.2 of the Settlement Agreement. The First Counterclaim, however, does not separately allege a breach of the Indemnification Agreement.

Section 7.8 of the Settlement Agreement provides in pertinent part that "the prevailing party in any action or proceeding which arises or relates to this Settlement Agreement shall be entitled to recover its costs and reasonable attorneys' fees in such action or proceeding." See CNB Counterclaim at ¶ 24.

Accordingly, those postpetition actions are not void. Compare Sundquist v. Bank of America, N.A. (In re Sundquist), 566 B.R. 563, 585 (Bankr.E.D. Cal. 2017) ("...any act done in violation of the automatic stay...is void from the outset for all purposes unless and until [the automatic stay is] annulled.").

As previously mentioned, RAS sought summary judgment on all of the claims in the Complaint, as well as on RAS's counterclaims. See discussion at 716, supra. Also as previously discussed, the prayer of the RAS Counterclaim seeks a declaration that RAS is the Declarant under the REA, that the REA Amendment is null and void, and that the filing of the REA Amendment constitutes slander of title. Additionally, the prayer of the RAS Counterclaim seeks an award of damages, costs of suit, and reasonable attorneys fees. Id.

Not surprisingly, prior dicta, comments, or observations in the case by the trial or appellate court are not to be treated as the "law" of the case. See Gertz v. Robert Welch, Inc., 680 F.2d 527, 533 (7th Cir. 1982), cert. denied, 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983).

It is not clear whether the REA Amendment remains in the chain of record title with respect to the Undeveloped Land.

Debtor argues that its commencement of this adversary proceeding is encompassed by a litigation privilege precluding liability under the Noerr - Pennington doctrine. See Opposition at 5:13 to 7:23. Having its genesis in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 135, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and United Mine Workers v. Pennington, 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the doctrine provides certain First Amendment immunities to parties who petition a department of the federal government for redress of their grievances. The Noerr - Pennington doctrine has been extended to civil litigation between private parties. See, e.g., Sosa v, DIRECTV, Inc., 437 F.3d 923 (9th Cir. 2006) (Noerr - Pennington doctrine required dismissal of civil RICO complaint that was based on pre-litigation correspondence mass mailed by satellite television provider). Unless litigation activity by the claimant is found to be a "sham," no liability may be imposed merely from the pursuit or commencement of a lawsuit. See International Longshore and Warehouse Union v. ICTSI Oregon, Inc., 863 F.3d 1178, 1187 (9th Cir. 2017). Merely alleging otherwise actionable conduct in a complaint, however, does not shield a litigant from the consequences of the conduct. In this instance, Debtor alleges in its own Complaint a variety of acts that occurred before the adversary proceeding was commenced, all of which interfered with CNB's foreclosure of the Undeveloped Property. Thus, the Noerr - Pennington doctrine does not apply in the instant case.

The USDC observed that despite the unambiguous language of the Settlement Agreement, both the Debtor and CNB took certain actions after the foreclosure sale that might "at best" indicate a genuine dispute as to the ownership of the Declarant Rights. See Reversal Order at 13 n.6. The existence of a genuine dispute, however, does not infer that one side or the other is acting in good faith.

In his declaration, Garff attests that the 2009 Garff Appraisal attached as Exhibit 5 to the SUF is a true and accurate copy of the original. See Garff Declaration at ¶¶ 5 and 6. An adequate foundation for the document therefore has been established under FRE 901(a).

Debtor focuses on the range of values expressed by the 2009 Garff Appraisal, Broker's Price Opinion, First Sale Agreement, and Final Sale Agreement, see Opposition at 12:15-23 & n.15, but does not object to McKenna's testimony as to the value of the Undeveloped Land at the time of the foreclosure sale. Moreover, Debtor does not offer any contrary evidence that would raise a genuine issue of fact regarding the value of the Undeveloped Land.

See also United States v. 10,031.98 Acres of Land, 850 F.2d 634, 636 (10th Cir. 1988) ; Everest Stables, Inc. v. Canani, 2011 WL 13213657, at *3 (C.D. Cal. Oct. 6, 2011) ; Holber v. Pocius (In re Pocius), 556 B.R. 658, 669 n.18 (Bankr. E.D. Pa. 2016) ; In re Winchester, 2013 WL 1195642, at *5 (Bankr. D. Wyo. Mar. 22, 2013).

The 2009 Garff Appraisal also has been offered as a business record maintained by CNB in the ordinary course of business. See Reply at 15 n.4; McKenna Declaration at ¶ 11; Supplemental McKenna Declaration at ¶ 4. Under FRE 803(6), a record of a regularly conducted activity is excepted from the hearsay rule. To the extent an appraisal prepared by a third party is kept and relied upon by a financial institution in the ordinary course of business, it may be considered for its probative value. The 2009 Garff Appraisal therefore serves as separate, independent, and additional evidence of the value of the Undeveloped Land at the time of the CNB foreclosure sale.

At the hearing on the Partial MSJ, Debtor raised an argument that does not appear in its written Opposition. It argues that CNB's First Counterclaim and Second Counterclaim seek the same relief as a deficiency judgment that must be sought within six months after a foreclosure sale pursuant to NRS 40.455(1). Because CNB's foreclosure sale took place on August 13, 2009, Debtor argues that the CNB Counterclaims filed on March 28, 2011, are barred under Nevada law. It maintains that under NRS 40.453, the provisions of the Settlement Agreement permitting CNB to seek damages equivalent to a deficiency is against public policy and cannot be enforced. Debtor's belated argument, however, is without merit. Nothing in the Settlement Agreement waives or even mentions the provisions of NRS 40.455, and the requirement for CNB to credit bid the full amount of its obligation was designed to and prevented a deficiency under the CNB Deed of Trust. Section 2.2 of the Settlement Agreement expressly permits CNB to seek damages in the event that the Debtor materially interferes with the foreclosure. That the amount of damages mirrors a deficiency that might have resulted from a regularly conducted foreclosure sale does not subject CNB's breach of contract and breach of implied covenant claims to the requirements of NRS 40.455.

In response to the Debtor's previous countermotion for summary judgment on the declaratory relief requested in Counts I and II of the Complaint, RAS raised the unclean hands doctrine. See RAS Prior Opposition at 12:8 to 13:11. RAS argued that the Debtor's request for declaratory relief actually constitutes a quiet title action under Nevada law that is equitable in nature. Id. at 12:14-16. It maintained that the Debtor "improvised a tale of secret agreements among related entities which contradicts the express REA Amendment," id. at 13:6-7, apparently constituting unclean hands. By contrast, CNB's First Counterclaim and Second Counterclaim are purely legal in nature because they are based on an express contract, i.e., the Settlement Agreement. As a result, the First Counterclaim and Second Counterclaim are not subject to the equitable defense of unclean hands.

Section 11.4 of the REA provides in pertinent part that if "Declarant or any Owner or Occupant shall bring an action against Declarant or any other Owner or Occupant by reason of the breach of any covenant, term or obligation hereof, or otherwise arising out of this Declaration, the prevailing Declarant, Owner or Occupant in such suit shall be entitled to its costs of suit and reasonable attorney's fees, which shall be payable whether or not such action is prosecuted to judgment."

The underlying motion had been filed by CNB on March 16, 2016, to which was attached the Motion by City National Bank for Attorney's Fees that originally was filed before the Ninth Circuit. (USECF No. 115).

CNB has requested that judgment be entered against New Boca and the Debtor in light of the prior Substitution Order. See Partial MSJ at 14:3-18; Reply at 19:13-16. As discussed at note 13, supra, the Substitution Order directed New Boca, as reorganized debtor and successor to the Debtor under the confirmed Chapter 11 plan, to satisfy the attorneys fees that had been awarded by the USDC in connection with the RAS Adversary appeal. The resulting CNB Fee Judgment was paid and CNB filed a Satisfaction of Judgment. Unlike the Substitution Motion, the instant Partial MSJ was filed only in the RAS Adversary and not in the Chapter 11 case. Although the Debtor opposed the Partial MSJ as a party to the RAS Adversary, New Boca did not respond, possibly because it is not a party to the RAS Adversary. Moreover, New Boca has asserted that it is not the actual debtor but only a related entity that purchased the Undeveloped Land. It has been required to pay the prior attorneys fee awards because under the confirmed Plan, see Plan, Art. IV., B.,4. and Art. VII., C., New Boca assumed joint and several liability of the Debtor to pay the claims of CNB arising from the RAS Adversary. At this time, the court will deny CNB's request for a judgment against New Boca in the instant adversary proceeding, without prejudice to CNB taking separate appropriate actions to enforce New Boca's contractual obligations arising out of the confirmed Plan. A monetary judgment in a separate civil action may be enforced by a writ of execution under applicable law. Likewise, if a properly requested motion to enforce the confirmed Plan results in a monetary award against New Boca, the resulting order may be enforced through the execution procedures of the State of Nevada. See Fed.R.Bankr.P. 9014(c) (FRBP 7069 applies in contested matters); Fed.R.Bankr.P. 7069 (FRCP 69 applies in adversary proceedings); Fed.R.Civ.P. 69(a)(1) (a money judgment is enforced by execution under the execution procedure of the state where the court is located). Under Nevada law, a garnishment of a bank account in Nevada may reach funds contained in a debtor's out-of-state accounts of the same bank. See Pacific Western Bank v. Eighth Jud. Dist., --- Nev. ----, 383 P.3d 252 (2016).

CNB's Fourth Counterclaim seeking compensatory and exemplary damages based on fraudulent inducement, Fifth Counterclaim seeking compensatory damages and legal expenses based on negligent misrepresentation, Sixth Counterclaim seeking special damages (including attorneys fees) based on slander of title, and its unnumbered request for rescission and/or reformation, still remain. Unless those remaining counterclaims are resolved, a judgment with respect to the instant matter may be entered only if an appropriate request is made pursuant to FRCP 54(b).